UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:17 CR 300 (HEA) |
| DAWN RHODES, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S TRIAL BRIEF AND
MOTION FOR PRE TRIAL ADMISSIBILITY OF EVIDENCE**

COMES NOW the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Gwendolyn Carroll, Assistant United States Attorney for said District, and submits the following trial brief.

**I.      Procedural History**

On July 5, 2017, a Federal Grand Jury returned a four count indictment against the defendant, Dawn Rhodes Hicks alleging False Statements Involving a Health Care Benefit Plan in violation of Title 18, United States Code, Section 1035(a)(l).   On April 3, 2018, the defendant waived pretrial motions (Doc. 45).

On May 24, 2018, a Federal Grand Jury returned a forty count superseding indictment against the defendant.   Counts one through twenty allege Health Care Fraud in violation of Title 18, United States Code, Section 1347.   Theses counts allege that the defendant knowingly and willfully executed a scheme and artifice to defraud, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare.

Counts twenty-one through forty allege False Statements Involving Health Care Benefit Plan in violation of Title 18, United States Code, Section 1035(a)(l).   These counts allege that the defendant knowingly and willfully made and used, materially false writings and documents knowing they contained materially false, fictitious, and fraudulent statements and entries in progress notes that were created in connection with the delivery of and payment for health care benefits, items, and services, in that the defendant created progress notes containing material misrepresentations as to the patient's condition, diagnosis and treatment, and caused the submission of the following claims.

On January 1, 2019, the defendant filed a Motion for Bill of Particulars. (Doc. 80) Following the Government's response (Doc. 81) the Magistrate Court held a hearing on February 25, 2019 and denied defendant's motion on March 13, 2019. (Doc. 89)

On February 7, 2019, the Government moved and dismissed Counts 7-20 and 27-40 of the superseding indictment. (Doc. 85).   Counts 1-6 and 21-26 remain for this trial.

## II.   <u>Overview of the Facts</u>

The government anticipates the evidence at trial will establish the following:

Beginning in February of 2013 until in or about October 2015, the defendant worked for a company called Aggeus Healthcare, P.C. ("Aggeus"), a multi-state podiatric services company employing dozens of podiatrists.   The company operated in the Eastern District of Missouri, among other locations.   Aggeus operated by sending its employee podiatrists, including the defendant, to residential care and skilled nursing facilities and offering podiatric services to the residents. Aggeus subsequently submitted claims to Medicare, among other insurance providers, for the services rendered by Aggeus podiatrists.

Beginning in March 2016 through in or about November 2016, the defendant worked for KG Health Partners, a podiatric services company based in Florida.  Like Aggeus, KG Health Partners employed a number of podiatrists whom it sent to provide podiatric services to patients located at skilled nursing and residential care facilities.   In February 2017 through in or about March 2018, the defendant worked for Absolute Health Internal Medicine and Pediatrics, and Elyaman Medical Services P.A. ("Absolute Elder Care), a healthcare services company based in Florida. Like Aggeus, Absolute Elder Care employed a number of podiatrists whom it sent to provide podiatric services to patients located at skilled nursing and residential care facilities.

The Medicare Program ("Medicare") is a federal health benefits program, as defined by 18 U.S.C. §24(b).   Medicare provides benefits to persons who are sixty-five years or older or disabled.   In general, Part A of the Medicare Program authorizes payment of federal funds for inpatient care in hospitals and skilled nursing facilities, while Medicare Part B authorizes payment for outpatient health services.   Individuals who receive benefits under the Medicare Program are referred to as Medicare beneficiaries.   The United States Department of Health and Human Services ("HHS"), through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program.   CMS acts through fiscal agents, which are private companies that process provider applications, review claims, and make payments to providers for services rendered to Medicare beneficiaries.   These companies are called Medicare Administrative Contractors ("MACs").

To receive Medicare reimbursement for services provided to eligible beneficiaries, healthcare providers, including podiatrists, must submit a written application and execute a written provider agreement.   The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.   After successful completion of the application process,

the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.   A health care provider uses the provider number to file claims with Medicare to obtain reimbursement for medically necessary services provided to eligible Medicare beneficiaries. Throughout the time alleged in the superseding indictment the defendant was an enrolled provider with Medicare.

The defendant's Medicare enrollment applications included a signed certification stating:

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

I agree to abide by the Medicare laws, regulations and program instructions that apply to me. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on my compliance with any application conditions of participation in Medicare.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

The Medicare program reimburses health care providers, including podiatrists such as the defendant, for medically necessary foot care services provided to eligible beneficiaries.   Medicare pays providers directly or pays the employer, if the provider has assigned the payments to the employer.   The Medicare Benefit Policy Manual ("Medicare Manual") sets forth the Medicare rules for what services are covered and will be reimbursed by Medicare.   With few exceptions, the Medicare program does not pay for routine foot care.   The Medicare Manual states that the "[s]ervices that normally are considered routine and not covered by Medicare include the following:

• The cutting or removal of corns and calluses;
• The trimming, cutting, clipping, or debriding of nails; and

4

> • Other hygienic and preventive maintenance care, such as cleaning and soaking the feet, the use of skin creams to maintain skin tone of either ambulatory or bedfast patients, and any other service performed in the absence of localized illness, injury, or symptoms involving the foot.
> Medicare Manual, Chapter 15, § 290, Foot Care."

Foot care that would otherwise be considered routine may be covered when systemic conditions such as metabolic, neurologic, or peripheral vascular disease result in severe circulatory embarrassment or areas of diminished sensation in an individual beneficiary's legs or feet. Medicare Manual, Chapter 15, § 290, Foot Care.  In the absence of a systemic condition that results in circulatory embarrassment, foot care that would otherwise be considered routine may be covered for an ambulatory patient if there is clinical evidence of mycosis of the toenail and the individual beneficiary has marked limitation of ambulation, pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate.  For non-ambulatory patients, treatment of mycotic nails may be covered if there is clinical evidence of mycosis of the toenail and the individual beneficiary suffers from pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate. Medicare Manual, Chapter 15, § 290, Foot Care.

Mycosis is a chronic, communicable infection caused by a fungus.  Nail debridement involves removal of a diseased toenail bed or viable nail plate.   This may be performed manually with an instrument or with an electric grinder. HHS/OIG, Medicare Payments for Nail Debridement Services, June 2002.

A Doppler study is a non-invasive ultrasound study used to diagnose vascular insufficiency. Medicare covers a Doppler study only if it is reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body

member. Social Security Act: 1862(a)(l)(A) - Medical Necessity: SEC. 1862. [42 U.S.C. 1395y] (a).

Medicare regulations require providers, including podiatrists, to maintain complete, true and accurate progress notes reflecting, in part, the purpose of the visit, the patients' chief complaint giving rise to the visit on that day, the medical assessment and diagnoses of the patients and the actual treatment and services provided.   These progress notes must include sufficient information to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the provider.   Medicare providers must retain clinical records, including progress notes, for the period of time required by state law or five years from the date of discharge if there is no requirement in state law.   Missouri law requires that physicians maintain patient records for a minimum of seven years from the date the last professional services were rendered.

A Medicare reimbursement claim must include certain information, including the beneficiary's name and Medicare number, the services that were provided to the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care professional who provided the services.   The reimbursement claim must also contain the diagnosis code reflecting the patient's condition(s), as well as a Common Procedural Terminology ("CPT") code that identifies each procedure or service provided. Reimbursement amounts are based on the CPT codes.

Medicare paid the defendant's employing companies (Aggeus, KH Health Partners, Absolute Elder Care), through the various Medicare provider numbers, via electronic funds transfer.   Aggeus compensated the defendant based on a percentage of the total Medicare reimbursements she had accrued for her employer.

From in or about February 26, 2013 through in or about October 1, 2015, Medicare paid approximately $761,700 for claims for reimbursement for the services the defendant purportedly provided to patients during her employment with Aggeus and for which the defendant completed progress notes.  From in or about ·March 17, 2016 through in or about November 11, 2016, Medicare paid approximately $183,150 for claims for reimbursement for the services the defendant purportedly provided to patients during her employment with KG Health Partners and for which the defendant completed progress notes.  From in or about February 2, 2017 through in or about December 21, 2017, Medicare paid approximately $34,670 for claims for reimbursement for the services the defendant purportedly provided during her employment with Absolute Elder Care and for which the defendant completed progress notes.

The progress notes completed and signed by the defendant for patients she treated through Aggeus, KG Health Partners, and Absolute Elder Care, included a subjective section, objective section, assessment/impressions section, and a plan of care.  The progress notes also included certain information about the patient, including the patient's gender, age, ambulatory status, cognitive status, and the underlying condition giving rise to the podiatrist's visit that day. Sometime the facility would receive a copy of the progress note from the defendant's employer company (Aggeus, KG Health Partners, Absolute Elder Care) and the progress note became a part of the patient's official medical record at the facility.  The progress notes were also the documentation used to support the claims billed to Medicare.

During her work with Aggeus, KG Health Partners, and Absolute Elder Care, the defendant falsified her patients' progress notes in a manner that would ensure reimbursement of services which otherwise would not be covered by Medicare.  As previously described, Medicare does not

reimburse for routine nail care, such as toenail trimming, in the absence of a systemic condition or certain class finding(s).

The defendant created progress notes that included misrepresentations and false information including, but not limited to, the following observations and findings regarding her patients:

  a. Patient experiences pain during ambulation;
  b. Mycotic, fungal toenails;
  c. Hammertoes;
  d. Nails separating from the nail bed;
  e. Atherosclerosis;
  f. Thick nails;
  g. Patient requests treatment because of lower extremity pain;
  h. The patient or staff request treatment because the toenails are painful, ingrown,
       and remain symptomatic even when the resident is resting;
  I. Systemic condition of peripheral vascular disease;
  J. The nails are symptomatic, elongated and dystrophic;
  k. Peripheral vascular disease.

On more than one occasion, the defendant falsely indicated in her progress notes that she had performed an incision and drainage procedure, when in truth and fact, she had not.   These false statements regarding the patient's systemic conditions, class findings and subjective condition, ensured that Medicare would reimburse for claims submitted for the defendant's services, even when such services would not have been reimbursable by Medicare, but for the defendant's misrepresentations.

**II.**   **Legal Issues**

   A.   Elements of the Offense

Counts one through six of the superseding indictment charge the defendant with violations of Title 18, United States Code, Section 1347, Health Care Fraud.   The elements of the offense are:

(1) That the defendant knowingly devised or participated in a scheme to defraud or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of Medicare in connection with the delivery of or payment for health care benefits, items, or services;

(2) That the defendant acted with the intent to defraud; and

(3) That Medicare was a public plan or contract, affecting commerce, under which medical benefits, items, or services were provided to any individual

Counts twenty-one through twenty-six of the superseding indictment charge the defendant with violations of Title 18, United States Code, Section 1035, False Statements.   The elements of the offense are:

(1) That the defendant made a materially false, fictitious, or fraudulent statement or representation or made or used any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

(2) That the defendant did so in connection with the delivery of or payment for health care benefits, items, or services involving a health care benefit program; and

(3) That the defendant did so knowingly and willfully.

B.      Definitions

A "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan or contract."   Medicare is a health care benefit program.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation is also "false" when it constitutes a half-truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.   A false representation is "material" if it has a natural tendency to influence, or is capable of influencing, the institution to which it is addressed.

To act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat. In considering whether the defendant acted with an intent to defraud, a jury may consider, among other things, whether the defendant acted with a desire or purpose to bring about some gain or benefit to herself or someone else at the expense of Medicare or with a desire or purpose to cause some loss

"Affecting interstate commerce" means any action, which in any way, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states.   The effect can be minimal.

IV.   **Evidentiary Issues**

A.   <u>Admissibility of Government's Exhibits</u>

The superseding indictment alleges a scheme to defraud Medicare and substantive counts of False Statements Relating to Health Care Benefit Programs.   The government's exhibits consist of excerpts from the patient medical records, the defendant's progress notes, Medicare claims data, the defendant's Medicare enrollment applications, Medicare local coverage determinations, the defendant's employment contracts with podiatric services companies, summary charts analyzing the claims data and emails sent by the defendant.   The government will mark for identification the patients' full files, but the government does not intend to admit the full patient files, many of which are several thousand pages, as evidence.   Should the defendant wish to cross-examine

witnesses using excerpts from the files other than those admitted by the government, the government does not intend to object to the defendant's admission of those excerpts.

Based upon discussions with defense counsel, the parties do not anticipate any argument concerning the admissibility of these exhibits.   In advance of trial, the parties will submit a stipulation regarding their agreement as to the admissibility of certain records.

In addition to the three patients identified in the indictment, the Government intends to introduce evidence, records, and testimony concerning numerous other patients who were allegedly seen and treated by the defendant.   The condition of these patients, and any care they many have needed or treatment they received is relevant substantive evidence of the scheme to defraud.   Evidence concerning these patients is intrinsic to the crimes charged.

B.     Relevant and Intrinsic Evidence - Fed Rule Evid. 403

Intrinsic evidence is that which "relate[s] to an integral part of the immediate context of the crime charged."   *United States v. LeCompte*, 108 F.3d 948, 952 (8th Cir. 1997) (citing *United States v. Waloke*, 962 F.2d 824, 828 (8th Cir. 1992)); *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir.) cert. denied, 479 U.S. 869 (1986).   The Eighth Circuit has repeatedly recognized that "[w]here evidence of other crimes is so blended or connected, with the ones on trial as that proof of one incidentally involves the others; or explains the circumstances; or tends logically to prove an element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged."   *United States v. Luna*, 94 F.3d 1156, 1162 (8th Cir. 1996); *United States v. Derring*, 592 F.2d 1003, 1007 (8th Cir. 1979); *United States v. Mandacina*, 45 F.3d 1177, 1188 (8th Cir. 1995).

Evidence of the defendant's progress notes and the medical records of patients other than the patients specifically named in the indictment is admissible as intrinsic evidence of the scheme

to defraud that is charged in the superseding indictment.   Such evidence helps "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" *United States v. Carter*, 549 F.2d 77, 78 (8th Cir. 1977).   Similarly, "[a] jury is entitled to know the circumstances and background of a criminal charge.   It cannot be expected to make its decision in a void – without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984).

In *United States v. Kirkham*, 129 Fed.Appx. 61, 65, 2005 WL 827119, *2 (5th Cir. 2005), the defendants were charged with executing a scheme or artifice to defraud a health care benefits program in violation of 18 U.S.C. § 1347.   The *Kirkahm* indictment was framed in much the same way as the Superseding Indictment charging defendant Rhodes with health care fraud:

> Part A of the indictment states the duration of the scheme, August 1996–2000, its location, the defendants' names, and the identities of several health care benefit providers that defendants were charged with defrauding. It goes on to describe the scheme as an effort to "obtain by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of health care benefit programs in connection with the delivery of and payment for health care benefits, items, and services."
>
> Part B of the indictment describes defendants' scheme in greater detail. It lists seven components of the scheme, including creating phony medical business entities and names, billing under the names of doctors who did not provide or supervise medical services, recruiting patients with false representations, providing false medical diagnoses, and using chiropractors and unlicensed personnel to recruit "patients" and render medical diagnoses and treatment consistent with the scheme and the amount of health insurance carried by the patient, rather than according to the true medical needs of the patient. Part B also states that the health care benefit programs provided payments to defendants based on the submission of false claims and diagnoses, and that defendants received and shared these proceeds pursuant to their scheme.
>
> Part C of the indictment lists 13 particular transactions executed or attempted to be executed in perpetrating the scheme to defraud. Each transaction listed included the date of the billing, the name of

12

the medical insurance provider, the doctor's name under which services were billed, and the name(s) of the patient(s). Four of these transactions named Lostetter as the physician providing services, one transaction named Kirkham and Lostetter as physician providers, and eight transactions named Murphy. All 13 listed transactions took place after August 1996.

*Id.* at 64-65.

On appeal, the *Kirkham* defendants challenged the trial court's admission of "evidence of fraudulent transactions that were not specified in the indictment" as impermissible per Fed.R.Evid. 404(b).  *Id.* at 73.  The defendants "contend[ed] that these transactions constitute evidence of extrinsic bad acts, requiring the trial court to weigh the probative value of the evidence against unfair prejudice to the defendants as a result of its admission.  Defendants argue[d] further that, as the government did not disclose its intention to introduce this evidence at trial pursuant to defendants' 404(b) motion to disclose, they did not receive fair notice that such evidence would be introduced against them at trial."  *Id.*

The Court of Appeals rejected the defendants' argument, holding that "*[i]f the existence of a scheme to defraud is an element of the offense, then acts and transactions constituting a part of that continuing offense are admissible as proof of the criminal enterprise.  Evidence of an uncharged offense arising out of a scheme or artifice to defraud is not 'extrinsic' within the meaning of 404(b) and thus not excludable on this ground.*  The prosecution may offer evidence of any surrounding circumstances that are relevant to prove intent or motive with respect to the fraudulent scheme."  *Id.* (emphasis added) (citing at n.48 *United States v. Stouffer*, 986 F.2d 916, 926 (5th Cir.1993)(926 ("[E]vidence relevant to establish the existence of a criminal enterprise is not extrinsic to the crime charged."); *United States v. Lokey*, 945 F.2d 825, 834 (5th Cir.1991)(holding evidence of similar crimes committed outside the temporal scope and

13

substantive counts of the indictment admissible "because it was relevant to establish how the

conspiracy came about, how it was structured, and how each appellant became a member"); *United*

*States v. Nichols*, 750 F.2d 1260, 1264–64 (5th Cir.1985)(holding evidence of defendant's

involvement in uncharged crimes admissible as it was intrinsic to the government's case in proving

the existence of a conspiracy)).

The Eighth Circuit pattern jury instructions outline the elements of health care fraud in

violation of 18 U.S.C. §1347 are as follows:

> **One,** the defendant knowingly executed or attempted to execute a
> scheme to defraud a health care benefit program, Medicare,
> Medicaid, etc.), *which scheme is described as follows*: (*describe*
> *scheme in summary form consistent with the manner it is charged in*
> *the Indictment*);
> **Two,** the defendant did so with intent to defraud;
> **Three,** the defendant did so in connection with the delivery of and
> payment for health care benefits, items and health care services; and
> **Four,** Medicare and Medicaid were public plans affecting
> commerce in some way or degree, under which the medical benefit,
> item, or service was provided to any individual;

Eight Circuit Pattern Instruction §6.18.1347 (emphasis added); *see also United States v.*

*Boesen*, 491 F.3d 852, 856 (8th Cir.2007) (internal citation omitted).   In short, the law requires

that the government prove the existence of a scheme to defraud a health care benefit program; and

in fact, the jury instructions require that the Court describe the scheme as charged in the Indictment.

The superseding indictment alleges that from February 2013 through March 2018 the defendant

knowingly and willfully executed a scheme and artifice to defraud, and to obtain, by means of

materially false and fraudulent pretenses, representations, and promises, money and property

owned by and under the custody and control of Medicare.   It also alleges that, during the same

time, the defendant knowingly and willfully made and used, materially false writings and

documents knowing they contained materially false, fictitious, and fraudulent statements and

14

entries in progress notes that were created in connection with the delivery of and payment for health care benefits, items, and services, in that the defendant created progress notes containing material misrepresentations as to the patient's condition, diagnosis and treatment, and caused the submission of the following claims.   As such, the government should be permitted to offer evidence of the defendant's misrepresentations of patients beyond specifically alleged in the Superseding Indictment as direct evidence of the existence of a scheme and artifice to defraud.

The Government's position is that no analysis under Federal Rule of Evidence 404(b) is necessary.   Evidence such as that detailed below is intrinsic when the evidence of the other acts and the evidence of the crime charged are "inextricably intertwined," when both acts are part of a single criminal episode, or when the other acts were necessary preliminaries to the crime charged. *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990); *United States v. Stovall*, 825 F.2d 817 (5th Cir. 1987); *United States v. Roylance*, 690 F.2d 164 (10th Cir. 1982).   Evidence is intrinsic when the acts complete the story of the crime on trial.  *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002), cert. denied, 536 U.S. 934 (2002); or evidence that explains the circumstances of the case. *United States v. Holt*, 460 F.3d 934 (7th Cir. 2006).

Rule 403 allows a Court to exclude relevant evidence on the grounds that its probative value is substantially outweighed by the danger of unfair prejudice.   Fed.R.Evid. 403.   Courts may discount the probative value of the disputed evidence if it poses a risk of unfair prejudice and an evidentiary alternative has equal or greater probative value. *Old Chief v. United States*, 519 U.S. 172, 182, 117 S.Ct. 644; *United States v. Becht*, 267 F.3d 767, 773 (8th Cir. 2001).   Here, the evidence is highly probative, relevant and is direct substantive evidence of the acts and scheme alleged in the superseding indictment.

During this timeframe the defendant worked for three different podiatric companies

15

(Aggeus, KG Health Partners, and Absolute Health Partners).   The superseding indictment alleges that the companies sent their employees, including the defendant "to residential care and skilled nursing facilities [to offer] podiatric services to the residents" and "to provide podiatric services to patients located at skilled nursing and residential care facilities."   It further alleges that the companies "subsequently submitted claims to Medicare, among other insurance providers, for the services rendered by Aggeus."   Evidence of the defendants' systematic misrepresentation of the diagnosis and treatment of the patients she billed for during the time frame alleged in the Amended Superseding Indictment is certainly relevant and intrinsic as it bears directly on the time frame and activities of the Defendant as alleged in the superseding indictment.   In other words, while there are specific patients listed, the claims associated with those particular patients are simply executions of a much broader scheme to defraud, and the superseding indictment clearly alleges the defendant engaged in activities beyond those three patients.   Inasmuch, evidence of the status of patients' health, their medical records, the defendant's treatment of those patients, progress notes she created and endorsed and money she received as a result during the times frame alleged in the indictment is direct, intrinsic evidence of the crimes alleged.

Evidence from the records of patients beyond the three charged in the Indictment illustrates the complete the story of the crime.   The Defendant saw and treated thousands of patients during the frame alleged in the indictment.   Evidence of the misrepresentations and diagnoses listed by the defendant in the progress notes of those additional patients is direct evidence of her crimes, particularly where the government's theory of the fraud is that the defendant systematically misrepresented her patients' conditions and treatments in order to increase the amount she was able to bill Medicare.   The evidence is intrinsic in that it demonstrates that the defendant knowingly and willfully executed her scheme and that she knowingly and willfully made

16

materially false writings, knowing they contained materially false statement.   The evidence demonstrates the defendant's state of mind and is part of the corpus of the crime.

The superseding indictment specifically identified twelve instances when the defendant allegedly treated patients at two different health care facilities.   In executing her scheme to defraud the defendant's conduct was not limited to the individuals or facilities specifically identified in the indictment.   Accordingly, evidence of any additional patients or treatment purportedly provided at other facilities falls within the purview of the superseding indictment and is evidence of the defendant's scheme to defraud, and to obtain, by means of materially false and fraudulent pretenses, representations.   Similarly, entries the defendant made or adopted in progress notes related to patients other than those identified in the superseding indictment are direct proof of her knowing and willful use of materially false writings and fraudulent statements

In addition to the allegations concerning the defendant's employment and treatment, the superseding indictment also alleges financial transactions that she benefitted from because of her scheme to defraud and submission of false statements.   It alleges, "from in or about February 26, 2013 through in or about October 1, 2015, Medicare paid approximately $761,700 for claims for reimbursement for the services the defendant provided to patients during her employment with Aggeus and for which the defendant completed progress notes."   It further alleges, "from in or about March 17, 2016 through in or about November 11, 2016, Medicare paid approximately $183,150 for claims for reimbursement for the services the defendant provided to patients during her employment with KG Health Partners and for which the defendant completed progress notes."   And finally, "from in or about February 2, 2017 through in or about December 21, 2017, Medicare paid approximately $34,670 for claims for reimbursement for the services the defendant provided

during her employment with Absolute Elder Care and for which the defendant completed progress notes."

These payments were not confined solely to the three patients listed in the superseding indictment.   Evidence of the defendant's misrepresentations to Medicare that enabled her to fraudulently bill Medicare, including the progress notes she completed, adopted and signed through Aggeus, KG Health Partners, and Absolute Elder Care, is intrinsic to the overall scheme and alleged crimes and the remuneration she received because of her criminal acts.

C.    Admissibility of Patient Statements concerning their heath conditions, care, and treatment

As previously noted, the Government intends to introduce medical records from various health care facilities.   The records indicate the condition of, and care provided to, various patients. Some records contain statements made by the patients to their treating health care providers.   On other occasions, Government witnesses who were responsible for care, medical diagnosis and treatment of their patients heard verbal statements made by their respective patients.   The Government intends to introduce these statements and, for the following reasons and they are not hearsay.

Fed.R.Evid 803 states in pertinent part:

the following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

(3) *Then-Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

(4) *Statement Made for Medical Diagnosis or Treatment*. A statement that:

18

(A) is made for — and is reasonably pertinent to — medical diagnosis or treatment; and

(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

In this case, there is evidence of verbal statements patients made to medical care professionals who treated them and statements memorialized in medical charts and records of the facilities.   Those statements fall squarely within these exceptions to the hearsay rule. They are clearly statements of the patient declarant's then-existing state of mind or physical condition.   They are all statements that describe the patients' physical conditions, medical treatment they received and did not receive, the condition of their body, their ambulatory status, their medical history, past or present symptoms, mental feelings, sensations, pain, and their overall health.   Thus, they are covered by Fed R. Evid. 803(3).

"A key circumstantial guarantee of trustworthiness in respect to Rule 803(3) is that it requires that statement be contemporaneous with the declarant's 'then existing' state of mind, emotion, sensation, or physical condition." *United States v. Naiden,* 424 F.3d 718, 722 (8th Cir.2005).   See also *United States v. Barraza,* 576 F.3d 798 (8th Cir. 2009); *United States v. DMarce*, 564 F.3d 989 (8th Cir. 2009 (mothers testimony about what daughter told her about sexual assault by defendant admissible as a mental, emotional, physical condition); *United States v. Woods*, 970 F.Supp 711 (8th Cir. 1997) (exhibits which represented portion of voluminous medical records of patient committed to hospital admissible, as statements of patient's mental condition, statements for purposes of medical diagnosis, records of regularly conducted activity, public records and reports, and as basis of medical expert's opinion).

Here patients told their respective treating medical professionals and caregivers how they felt, whether they had pain, whether they were experiencing symptoms of any medical conditions, their emotional state, and other health related matters.   They described treatments or procedures that were, or were not, rendered to them.   They are statements the medical health care providers relied on to care for and treat their patients.   An attending health care professional is allowed to relate statements made by patients based upon the principle that one who speaks to a health care provider tells the truth because the patient knows that his or her treatment depends upon their comments.   Such statements were made so that a patient could receive the appropriate medical care, be treated for symptoms the patient described, be cured or improve their health condition, and to avoid medical mistakes or oversights.   Treating health care professionals rely on the comments and, as a result, they are trustworthy statements.   This is the very reasons 803(3) was adopted.   They clearly fall with the then-existing state of parameters of Fed R. Evid. 803(3).

Similarly these statements are also statements made for medical diagnosis or treatment of the respective patients for purposes of Fed R. Evid. 803(4).   They are statements that describe medical history, past or present symptoms or sensations, their inception, or their general cause for purposes of Fed. R. Evid. 803(4).   The rule allowing admission of statements made for purposes of obtaining medical diagnosis and treatment is widely accepted and firmly rooted hearsay exception. *United States v. Renville*, 779 F.2d 430 (8th Cir. 1985).   The crucial question under the rule is whether the out-of-court statement of the declarant was "reasonably pertinent" to diagnosis or treatment. *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980).

The Eighth Circuit set forth a two-part test for the admissibility of hearsay statements under rule 803(4).   First, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is

20

reasonably relied on by a physician in treatment or diagnosis. *Id*. at 84. *See also Roberts v. Hollocher*, 664 F.2d 200, 204 (8th Cir.1981).   The test reflects the twin policy justifications advanced to support the rule.   Courts understand that a patient has a strong motive to speak truthfully and accurately because the treatment or diagnosis will depend in part upon the information conveyed.   The declarant's motive thus provides a sufficient guarantee of trustworthiness to permit an exception to the hearsay rule.   *Iron Shell*, 633 F.2d at 84.   The Eighth Circuit has held that "a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription."   *Id*.   *See also*, *United States v. Bercier*, 506 F.3d 625 (8th Cir. 2007) (victim's statement made to nurse upon arrival at emergency room that she was assaulted was admissible in defendant's prosecution for sexual assault under hearsay exception for statements made for purpose of obtaining medical diagnosis); *Lovejoy v. United States*, 92 F.3d 628 (8th Cir 1996) (mother's statements to nurse about child victim (who could not orally communicate) of attempted sexual abuse was being examined by nurse in connection with allegations were admissible); *United States v. Kappell*, 418 F.3d 550 (6th Cir. 2005) (victim's statements made to psychotherapist and social worker were admissible under hearsay exception for statements made for purposes of medical diagnosis or treatment); *United States v. Tome*, 61 F.3d 1446 (10th Cir.1995) (statements made in the course of procuring medical services, where declarant knows that false statement may cause misdiagnosis or mistreatment are admissible under exception to hearsay rule, since such statements carry special guarantees of credibility).

Any statements the Government intends to offer meet the two-part test.   The patients' motives for making the statements are consistent with the purposes of promoting treatment and health care.   Further, the content of the statements were reasonably relied on by treating medical care personnel.

21

D.    Admissibility of Peer Comparison Evidence

The government's evidence will demonstrate that from 2013-2015, Dawn Rhodes diagnosed over 99% of the patients she billed to Medicare with PVD.   By comparison, during that same time frame, Dawn Rhodes' peers (Missouri podiatrists who billed Medicare during that same time period) billed to Medicare no more than 25% of their patients as having PVD.   The government intends to offer this evidence to demonstrate the defendant's fraudulent intent in misrepresenting the condition of her patients in order to cause Medicare to reimburse her claims. Courts have repeatedly affirmed the government's use of peer comparison data in health care fraud cases in order to establish intent.   *See United States v. Patel*, 485 F. App'x 702, 709 (5th Cir. 2012) (finding that sufficient evidence of intent where the government's evidence at trial included a peer comparison reflecting the fact that the defendant performed "invasive diagnostic angiograms and stented more often than his peer cardiologists," because based on that evidence, "[t]he jury could conclude that Dr. Patel represented necessity where none existed. There was also evidence that could support the inference that he had contributed to the falsification of patients' records."); *United States v. McLean*, 715 F.3d 129, 140 (4th Cir. 2013) (finding that the defendant's health care fraud conviction was "supported by substantial evidence" where "[t]he government used the evidence to show that McLean placed twice as many stents on average in each patient he chose to stent as his peers"); *United States v Alexander*, 748 F.2d 185, 188-89 (4th Cir. 1984) (no abuse of discretion where district court admitted peer group analyses which showed that defendant ranked first or second among other doctors in the area for certain gynecological tests; evidence supported "the 'non-performed tests' theory of guilt"); *United States v. Russo*, 480 F.2d 1228, 1243 (6th Cir. 1973) (comparison of defendants' claims with the claims of all 10,000 doctors in Michigan properly admitted to support the inference that "the defendants did not

actually perform the extremely large numbers of certain designated medical procedures for which they were paid"); *see also United States v. Ahmed*, No. 14-CR-277 (DLI), 2016 WL 8732355, at *10 (E.D.N.Y. June 24, 2016).   As such the government respectfully requests that this Court admit evidence of the prevalence of Dawn Rhodes' use of the PVD diagnosis code versus that of her peers.

## V.   Logistical Issues

### A.   Summary and Demonstrative Exhibits

The Government intends to use various charts, summary exhibits and demonstrative presentations during the course of trial.   The exhibits will be used to summarize the investigation chronology, the technical bulk of medical records and progress notes, illustrate how the Medicare process works, and the types of claims covered by Medicare.

It has long been the rule that charts of the sort involved here may be shown to the jury during the trial in the discretion of the trial court in order that they "may guide and assist the jury in understanding and judging the factual controversy."   *United States v. Downen*, 496 F.2d 314, 321 (10th Cir. 1974).   *See also United States v. Johnson*, 319 U.S. 503, 519 (1942); *United States v. Orlowski*, 808 F.2d 1283, 1289 (8th Cir. 1986); *United States v. Nelson*, 735 F.2d 1070, 1072 (8th Cir. 1984); *United States v. Katz*, 705 F.2d 1237 (10th Cir. 1983); *United States v. Behrens*, 689 F.2d 14 (10th Cir.) cert. denied, 103 S. Ct. 573 (1982); *United States v. King*, 616 F.2d 1034, 1041 (8th Cir.), cert. denied, 446 U.S. 969 (1980); *United States v. Skalicky*, 615 F.2d 1117, 1120-21 (5th Cir.), cert. denied, 449 U.S. 832 (1980); *United States v. Foshee*, 606 F.2d 111, 113 (5th Cir. 1979), cert. denied, 444 U.S. 1082 (1980); *United States v. Scales*, 594 F.2d 558, 561-64 (6th Cir.), cert. denied, 441 U.S. 946 (1979); *United States v. Normile*, 587 F.2d 784, 787 (5th Cir. 1979); *United States v. Ellenbogen*, 365 F.2d 982, 988 (2d Cir. 1966), cert. denied, 386 U.S. 923

23

(1967).

Charts and exhibits which summarize voluminous evidence are permissible under Rule 1006 which states:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

*See City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033 (9th Cir. 1983); *United States v. Johnson*, 594 F.2d 1253, 1254-57 (9th Cir.), *cert. denied*, 444 U.S. 464 (1979); *United States v. Smyth*, 556 F.2d 1179 (5th Cir. 1977).

The Eighth Circuit, in *United States v. Smallwood*, 443 F.2d 535 (8th Cir. 1971), *cert. denied*, 404 U.S. 853 (1971), allowed the admission of charts that summarized other exhibits. The court stated, as follows:

> The court room use of summaries of business records, particularly where the actual records are voluminous and complex, is not only proper but advisable.   (Citations omitted)   Evidential use of such summaries rests within the sound discretion of the trial judge, whose action in allowing their use may not be disturbed by the appellate court except for an abuse of discretion. Id. at 540. See also King, 616 F.2d at 1034.

In *Smallwood*, the summaries in issue were based on materials already in evidence or that were being admitted.   The same will be true here.   Any alleged inaccuracies in the summaries go, according to *Smallwood*, to the weight to be accorded the summaries, not to their admissibility. In *Smallwood*, the court cited with favor a prior Eighth Circuit case which reasoned, "[e]xhibits which may facilitate understanding of complex factual issues are to be encouraged for court room use." *Boston Securities, Inc. v. United Bonding Insurance Co*., 441 F.2d 1302, 1303 (8th Cir. 1971).   *See also United States v. Brickey*, 426 F.2d 680, 686-87 (8th Cir.), *cert. denied*, 400 U.S. 828 (1970); *Ping v. United States*, 407 F.2d 157, 159-160 (8th Cir. 1969) (summaries of checking

accounts records in criminal tax case).

Thus, it is clearly within the discretion of the trial court to allow the use of charts at trial where they would be of assistance to the jury, subject to the appropriate limiting instructions, and such discretion will be subject to review only upon a clear showing of abuse and resulting prejudice to the opposing party.   *Smallwood*, 443 F.2d at 540; *Brickey*, 426 F.2d at 686-87; *King*, 616 F.2d at 1034.

The use of charts in the opening statement and closing argument is governed by the same principles that apply to the use of charts at trial.   *See United States v. Churchill*, 483 F.2d 168 (1st Cir. 1973); *United States v. Rubino*, 431 F.2d 284 (6th Cir. 1970).   As described above, the charts will help the jury picture the structure of the transactions at issue and the relationships of the defendants, witnesses and entities involved, thereby effectuating the recognized goal of an opening statement -- "to give the broad outlines of the case to enable the jury to comprehend it, " *Virgin Islands v. Turner*, 409 F.2d 102, 103 (3d Cir. 1969), and "to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *United States v. Dinitz*, 424 U.S. 600 (1976).

D.   Expert Testimony

At trial, the Government plans to introduce expert opinion testimony from Dr. Edwin Wolf, a podiatric surgeon, regarding his review of progress notes created by Dawn Rhodes and his review of the files of the patients for whom Dawn Rhodes created those note.   Dr. Wolf will testify regarding his conclusion that the assessments and diagnoses in Dr. Rhodes' progress notes are not supported by or consistent with the other records in the patient files.

The Government has given prior notice to the defendant of this expert and the topics that the expert will cover.   The Government will qualify the witness as an expert on the basis of the

witness' education, training and experience including participation in _____.

Under the prevailing law, the Government's anticipated opinion testimony is clearly admissible.

Pursuant to Fed. R. Evid. 702, a qualified witness may testify as an expert, "(i)f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. " Fed. R. Evid. 702. The expert's testimony is still admissible even if it "embraces an ultimate issue to be decided by the trier of fact." Fed.R.Ev. 704. Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge that will not be disturbed absent a clear abuse of discretion. *United States v. Daniels*, 723 F.2d 31, 33 (8th Cir. 1983). See also, *United States v. Fleishman*, 684 F.2d 1329, 1335 (9th Cir. 1982), cert. denied, 103 S.Ct. 464 (1983); *United States v. Freeman*, 514 F.2d 1184, 1191 (l0th Cir. 1975).

## VI.    <u>Conclusion</u>

The foregoing are the issues that the Government expects to arise in the trial of this matter. The Government respectfully requests a pre trial ruling concerning the admissibility of certain exhibits identified herein.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

  *s/ Gwendolyn Carroll*
GWENDOLYN CARROLL NY 4657003
Assistant United States Attorney
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2019, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Gwendolyn E. Carroll*
Gwendolyn E. Carroll NY 4657003
Assistant United States Attorney
