IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:17CR300 HEA |
| | ) |
| DAWN RHODES | ) |
| | ) |
| Defendant. | ) |

### SUPPLEMENT TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

COMES NOW, counsel for defendant, Kayla L. Williams, Assistant Federal Public Defender, and hereby supplements her pro se motion for Compassionate Release. In support, counsel states the following:

Dawn Rhodes, is a 44 year old, African American woman who suffers from asthma, a pre-existing condition identified by the Center for Disease Control ("CDC") as being potentially high risk for COVID-19 complications. She is an inmate at Aliceville FCI, a low security federal correctional institution, with an adjacent minimum security camp, and is requesting the Court to reduce her sentence to time served or in the alternative, to modify her sentence to release her immediately to home confinement as a condition of supervised release under 18 U.S.C. §3582(c)(1)(A)(i).

While Ms. Rhodes' medical records do not indicate whether she has mild, moderate, or severe asthma, they do indicate when she entered the facility, she needed the assistance of an inhaler once or twice a week, since her incarceration, and the increased

use of solitary confinement as a medical isolation tool, she has needed to use her albuterol inhaler almost every day. According to the latest CDC guidelines, immunocompromised individuals such as those who suffer from asthma may be at a higher risk for severe illness from COVID-19.[1] Because there are currently inmates and staff members who are actively positive in her facility, there is a greater risk of exposure.[2]

COVID-19 presents an unprecedented public health risk, with a particularly high risk to the health on individuals in confined spaces. Accordingly, the global public health response has been to promote isolation, quarantine, and "social distancing." None of these measures can be adequately implemented in a prison environment. The unprecedented threat of COVID-19, which could not have been foreseen at Ms. Rhodes' sentencing, poses extraordinary risks to the health of prisoners generally, and to Ms. Rhodes specifically. The measures necessary to contain and prevent infection are difficult, if not impossible, to achieve in a prison environment.

The growing threat of the COVID-19 pandemic, and its proliferation within the prisons, provides an extraordinary and compelling basis for a sentence reduction or modification for an inmate who is particularly medically vulnerable, where that inmate is not a threat to the community or to any person, and where their other personal characteristics weigh in favor of a reduction or modification of their sentence. The existence of the COVID-19 virus in the facility where Ms. Rhodes is incarcerated, in combination with her medical condition, makes her particularly vulnerable to dire

---

[1] *See* CDC, *People Who Are at Higher Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[2] *See* BOP, *COVID 19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/;

consequences if she contracts the virus. A reduction to a sentence of time served or to home confinement for Ms. Rhodes would be sufficient, but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. §3553(a) and to protect the public.

## STATUTORY FRAMEWORK FOR SENTENCE REDUCTION AUTHORITY UNDER 18 U.S.C. §2582(C)(1)(A)(I)

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. §3582(c)(1)(A)(i). As amended by the First Step Act, the statute provides:

> (1) In any case—
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.][3]

Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant

---

[3] 18 U.S.C. § 3582(c)(1)(A) (emphasis added).

sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served or (4) compelling family circumstances.[4] The commentary also includes a fifth catch-all provision for "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons.[5]

In determining whether or not an "extraordinary and compelling reason" exists to justify a reduction in a term of imprisonment, this Court is not limited to the reasons listed in the applicable policy statements found in U.S.S.G § 1B1.13 (and its application note). As Judge Catherine D. Perry noted in *Littrell*, that section is now inconsistent with the amended statute, having not been amended since passage of the First Step Act.[6] As a result, "many courts have found that the guideline does not limit the factors that the court may consider."[7] The policy statement in § 1B1.13 was last amended in November 2018,

---

[4] U.S.S.G. §1B1.13 comment. n.1(A)-(C).
[5] U.S.S.G. §1B1.13 comment. n.1(D).
[6] *See Littrell*, at *9 (E.D. Mo. May 19, 2020) (Perry,J.).
[7] *Id.* t *10 (citing *United States v. Maumau*, 2:08-cr-00758

before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute.[8] In *United States v. Cantu,* the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of the sentence-modification provisions under § 3582.[9]

Similarly, in *United States v. Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants."[10] Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"[11]

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed.[12] In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought

---

[8] *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases).
[9] No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original).
[10] *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020).
[11] *Id.*
[12] *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change").

by the BOP Director in the first instance."[13] "[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it."[14]

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."[15] The court in *Young*, followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."[16]

Additionally, "on May 18, 2020, the Department of Justice issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors, including: 1. *Asthma* (moderate to severe) . . . *can*

---

[13] 2020 WL 1248493, at *7 (citing cases).
[14] *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) (internal quotation marks omitted).
[15] No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).
[16] *Id. See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *Maumau*, at *2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law) (citing ten other cases); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019) ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

establish that *"extraordinary and compelling reasons" warrant the reduction in sentence."*[17] Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13 commentary.

RELEVANT FACTS AND PROCEDURAL HISTORY

On August 13, 2019, this Court sentenced Ms. Rhodes to 18 months in prison following her pleas of guilty to health care fraud, in violation of 18 U.S.C. § 1437, and false statements relating to health care matters, in violation of 18 U.S.C. § 1035, with each count to run concurrent with one another. At the sentencing, Ms. Rhodes' medical history was only briefly mentioned in her presentence investigation report ("PSR"), as it was not a significant factor in sentencing her at the time. However, the PSR does record that Ms. Rhodes has severe asthma and has suffered respiratory failure twice (ECF No. 129). At the time of sentencing, a global pandemic that results in extreme long-term illness, organ damage, and death did not exist, and was not a factor that this Court could consider in fashioning a requisite sentence. The BOP projects a release date for Ms. Rhodes of February 26, 2021, and a home confinement date of January 26, 2021.

---

[17] *See* Government's Supplemental Response (Dkt. No. 43), *United States v. Firebaugh*, No. 1:16-cr-20341-UU at *1 (S.D. Fla. June 1, 2020) (emphasis added).

Ms. Rhodes has been in custody in connection with the present offenses since, November 19, 2019, a period of nine months. She is a first time offender and her convictions are for non-violent offenses, she is free of any disciplinary violations in custody, and she has taken some steps towards rehabilitation, by completing two classes since her arrival. All of this demonstrates that Ms. Rhodes would not be a danger to the community in the event that she is released.

ARGUMENT

   I.  Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Ms. Rhodes' Sentence.

The First Step Act permits Ms. Rhodes to move this court to reduce or modify her term of imprisonment and seek compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i). A defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on her behalf; or (2) there has been a lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Ms. Rhodes files this motion in light of the urgent nature of her request.

   a. Ms. Rhodes Has Exhausted the Administrative Relief Requirement.

Prior to filing her *pro se* motion with the court, Ms. Rhodes sought relief through the BOP. On April 23, 2020, Ms. Rhodes wrote a letter to the warden requesting compassionate release[18]. On April 24, 2020, the warden responded that her request would be forwarded to her Unit Team to address[19]. As of the date of her *pro se* filing with the court, no request had been made on her behalf by the Warden or her Unit Team. The BOP

---
[18] Exhibit A.
[19] *Id.*

has notoriously failed to exercise its compassionate release authority, indicating that these kinds of requests, absent imminent death, are futile[20].

Accordingly, this Court has the authority to determine whether extraordinary and compelling circumstances exist to modify her sentence.

### b. "Extraordinary and Compelling Reasons" Warrant a Reduction of or Modification to Ms. Rhodes' Sentence.

The worldwide pandemic that now threatens human populations could not reasonably have been foreseen by the court at the time of sentencing. COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Ms. Rhodes. Her heightened vulnerability to COVID-19 complications due to her medical risk is an extraordinary and compelling reason that this Court may reasonably find to warrant a reduction or modification of sentence.

Social distancing is not possible in a prison setting. A declaration by Dr. Brie Williams, Professor of Medicine at the University of California, San Francisco, which has been submitted in compassionate release applications a states:

> Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. They eat together at small tables that are cleaned only irregularly. Some are not given tissues or sufficient hygiene supplies. Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as lack of hand sanitizer or sufficient opportunities to wash hands.[21]

---

[20] *See* U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of Prisons Compassionate Release Program* (Apr. 2013), oig.justice.gov/reports/2013/e1306.pdf (finding the BOP compassionate release program to be scatter-shot and disorganized, increasing costs) *United States v. Rodriguez*, 2020 WL 1627331, 2 (E.D. Pa. 4/1/20). *See also Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).
[21] *See* Declaration of Dr. Brie Williams (Exhibit B).

The Centers for Disease Control and Prevention ("CDC") warns that "older adults and people of any age who have serious underlying conditions might be at higher risk for severe illness from COVID-19".[22] The CDC lists the serious underlying medical conditions to include: "people with moderate to severe asthma."[23]

Ms. Rhodes has been diagnosed with a condition that the CDC lists as serious underlying medical condition that may lead to severe illness from COVID-19. Ms. Rhodes has severe asthma with a history of serious complications, including two separate instances of respiratory failure. She is prescribed Albuterol to treat and prevent asthma attacks.[24]

Allowing Ms. Rhodes to finish out her sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the coronavirus pandemic, especially given the threat to her health. Several courts have found that asthma is a condition warranting compassionate release, particularly in light of the coronavirus.[25]

Because of her incarceration, Ms. Rhodes is unable to take steps such as social distancing to prevent infection by the virus that caused COVID-19. It is unclear whether she would have access to testing, even if she has been exposed to other individuals who are positively infected due to the lack of testing for asymptomatic patients. According to Ms.

---

[22] *See* CDC *Cornoavirus Disease 2019 (COVID-19), People Who Are at Higher Risk for Severe Illness*. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed June 15, 2020) (emphasis added).
[23] *Id.*
[24] *See* Exhibit C.
[25] *United States v. Mills*, No. 13-CR-20487-GAD, 2020 WL 4431425, (E.D. Mich. Jul. 31, 2020) (granting compassionate release to defendant with asthma, high blood pressure, and BMI of 34, noting that daily inhaler use in a facility which places individuals like Defendant in a 22 hour lockdown demonstrates the [asthma] condition's seriousness); *United States v. Rodriguez*, No. 3:17-CR-4477-BTM, 2020 WL 4592833, (S.D. Cal. Aug. 5, 2020).

Rhodes, the facility is not widely testing inmates in the facility. No tests are being done unless there is known exposure to someone who is positive or if someone is exhibiting the well-known symptoms of coughing, fever, or shortness of breath. Because she is uniquely vulnerable to serious complications from a COVID-19 infection, her health outcome if she becomes infected could include serious permanent debilitation or even death[26].

Rush Medical Center recently released a study concluding that asthma has been found to be associated with longer time on ventilators, even for younger COVID-19 patients.[27] Notably, this study does not differentiate between mild, intermittent, or moderate to severe asthma.[28] Scientists suspect that the COVID-19 disease "will also leave in its wake a potentially large population with post-viral problems that could be lifelong and, in some cases, disabling."[29]

Ms. Rhodes was originally housed at the camp, but on April 28, 2020, she was transferred to the low security correctional institution due to her medical vulnerabilities. Because of her vulnerabilities, the facility has chosen to put those most at risk in a separate wing under solitary confinement for 22 hours out of the day. In addition, the

---

[26] *See Here's the Damage Coronavirus (COVID-19) Can Do to Your Lungs,* The Cleveland Clinic (Mar. 20, 2020) https://health.clevelandclinic.org/heres-the-damage-coronavirsu-covid-19-can-do-to-your-lungs/ (noting the post-infections complications including acute respiratory distress syndrome and lung scarring that can cause permanent damage).

[27] Rush Medical Center Press Release, *Asthma Associated with Longer Time on Ventilators for Younger COVID-19 Patients*, available at https://www.rush.edu/news/press-releases/asthma-associated-longer-time-ventilators-younger-covid-19-patients.

[28] *Id.*

[29] Brian Vastag, *Researchers Warn COVID-19 Could Cause Debilitating Long-Term Illness in Some Patients,* The Seattle Times (May 30, 2020), *available at*: https://www.seattletimes.com/nation-world/researchers-warn-covid-19-could-cause-debilitating-long-term-illness-in-some-patients/ (last accessed June 3, 2020).

facility is spraying bleach on each cell door, which has caused Ms. Rhodes to have further asthma complications.

In the nine months that Ms. Rhodes has been in Aliceville she has not seen a doctor. She is reliant on Albuterol, which is a rescue inhaler. The frequency that Ms. Rhodes is using her rescue inhaler is indicative that her asthma is not under control, and that she needs to be examined for a long-term acting inhaler prescribed specifically for control.[30]

FCI Aliceville has a population of 1,114 inmates, with an additional 171 at the adjacent minimum security satellite camp. FCI Aliceville has nine confirmed active cases of COVID-19 among inmates, and 10 confirmed active cases among staff.[31] It is reasonable to believe that the number of infections at FCI Aliceville could still increase substantially. On June 16, 2020, a New York Times article warned that:

> Cases of the coronavirus in prisons and jails across the United States have soared in recent weeks, even as the overall daily infection rate in the nation has remained relatively flat. The number of prison inmates known to be infected has doubled during the past month to more than 68,000. Prison deaths tied to the coronavirus have also risen, by 73 percent since mid-May. By now, the five largest known clusters of the virus in the United States are not at nursing homes or meatpacking plants, but inside correction institutions.[32]

Because of her underlying medical conditions, Ms. Rhodes also faces increased risk that she will be hospitalized if she contracts COVID-19. CDC data released on June 15, 2020, indicates that people with underlying medical conditions who were infected were hospitalized six times as often as healthy individuals who were

---

[30] *See* https://www.webmd.com/asthma/guide/asthma_inhalers_bronchodilators.
[31] Bureau of Prisons, *COVID-19 Cases,* accessed August 14, 2020, https://www.bop.gov/coronavirus/.
[32] Timothy Williams, Libby Seline and Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, The New York Times (June 16, 2020), *available at*: https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html?action=click&module=Top%20Stories&pgtype=Homepage (last accessed June 16, 2020).

infected, and twelve times as likely to die.[33] If Ms. Rhodes is released, including to home confinement, the likelihood that she will be infected and hospitalized will be greatly reduced.

### II. Ms. Rhodes Has a Stable Home to Live In, if Released to Home Confinement, Where She Will Be Safer and While Still Ensuring Public Safety.

Ms. Rhodes is a first-time offender, with a BOP security classification as "minimum," and a "minimum-risk" recidivism level. If this Court sees fit to release Ms. Rhodes to home confinement, she will live with her brother, Keith Rhodes, in Atlanta, Georgia. Mr. Rhodes is employed as a flight attendant, and he has a three bedroom, two bathroom home. He and Ms. Rhodes would be the only occupants, which allows for both of them to have separate bedrooms and bathrooms, which would allow Ms. Rhodes to safely quarantine if necessary.

Confinement in the home environment would be significantly safer for Ms. Rhodes, as her exposure to COVID-19 would be severely limited. Because of the non-existent disciplinary record, the high risk of complications if she were to contract COVID-19, the fact that she has served half of her sentence, and the opportunity of family care and support, the public is not at risk if she would be released now to home confinement.

CONCLUSION

---

[33] Lena Sun, *Patients with underlying conditions were 12 times as likely to die of covid-19 as otherwise healthy people, CDC finds*, The Washington Post (June 15, 2020), *available at*: https://www.washingtonpost.com/health/2020/06/15/patients-with-underlying-conditions-were-12-times-more-likely-die-covid-19-than-otherwise-healthy-people-cdc-finds/ (last accessed June 15, 2020).

Ms. Rhodes' medical vulnerability to complications from COVID-19, and her current residence at an infected facility are extraordinary and compelling reasons that warrant a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

For the foregoing reasons, Ms. Rhodes respectfully requests that this court exercise its authority to modify her sentence and sentence her to time served or home confinement.

Respectfully submitted,

/s/Kayla L. Williams
KAYLA L. WILLIAMS
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Kayla_Williams@fd.org

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2020, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Jillian Anderson, Assistant United States Attorney.

/s/Kayla L. Williams
KAYLA L. WILLIAMS
Assistant Federal Public Defender